JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
Missoula Branch Office
125 Bank Street, Suite 710
Missoula, Montana 59802
Phone: (406) 721-6749
Fax: (406) 721-7751
Email: john_rhodes@fd.org

Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CR 24-15-M-DLC** |
| Plaintiff, | |
| vs. | **DEFENDANT'S** |
| | **SENTENCING** |
| BRETT MAURI, | **MEMORANDUM** |
| Defendant. | |

BRETT MAURI, the above-named Defendant, by and through his counsel of record, JOHN RHODES and the FEDERAL DEFENDERS OF MONTANA, hereby submits this sentencing memorandum in support of his request for a below-Guidelines sentence. The Sentencing Commission's 2023 Sourcebook informs that only 37.5% of economic offenders were sentenced within the Guidelines. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-

reports-and-sourcebooks/2023/TableE7.pdf. *See also*, *e.g.*, *United States v. Musgrave*, 647 Fed. Appx. 529 (6th Cir. 2016).[1]

Following a trial, Mr. Mauri was convicted of four counts of wire fraud, pursuant to 18 U.S.C. § 1343, and two counts of money laundering, pursuant to 18 U.S.C. § 1957(b)(1). Mr. Mauri maintains his innocence.

The Final Presentence Report ("PSR") calculates a total offense level of 27 and a criminal history category of II. The recommended sentencing guidelines range is 78-to-97 months. Mr. Mauri disputes the calculation of the guidelines. *See infra*.

The PSR also recommends the Court order restitution in the amount of $1,855,025.25. PSR ¶ 172. Mr. Mauri disputes the restitution calculation. Should the Court's restitution decision result in less than $1,500,000 in restitution, that

---

[1]

> But there is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances. *See United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013)(Underhill, J., concurring)(citing *Kimbrough*, 552 U.S. at109–10 (same for crack cocaine)); *see also* Mark H. Allenbaugh,*"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013) ("[T]he data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases.")

*Id*. at 538-39.

finding would reduce the Guidelines loss amount level by two-points. U.S.S.G. § 2B1.1(b)(1); PSR ¶ 77.

## PSR DISPUTES

Mr. Mauri disputes the two-point "obstruction of justice" enhancement. PSR ¶ 81.

In *United States v. Dunnigan*, 507 U.S. 87, 94 (1993), the Supreme Court confirmed the constitutionality of applying the two-point "obstruction of justice" enhancement at U.S.S.G. § 3C1.1[2], but emphasized strict boundaries:

> [N]ot every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury. As we have just observed, an accused may give inaccurate testimony due to confusion, mistake, or faulty memory. In other instances, an accused may testify to matters such as lack of capacity, insanity, duress, or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent. For these reasons, if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same, under the perjury definition we have set out. *See* USSG § 6A1.3 (Nov. 1989); Fed. Rule Crim. Proc. 32(c)(3)(D). *See also Burns v. United States*, 501 U.S. 129, 134, 115 L. Ed. 2d 123, 111 S. Ct. 2182 (1991). When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding.

---

[2] For the record, Mr. Mauri challenges the constitutionality of the enhancement, as violating the Fifth and Sixth Amendment rights to due process, testify, and trial by jury.

*Id.*[3]

The Ninth Circuit enforces these boundaries.

Where the district court fails to make express factual findings of perjury, the defendant's substantial rights to take the stand and testify in his own defense may be chilled, calling the fairness and integrity of the proceedings into question.

> Obstruction of justice is a serious charge, and requires serious proof. To enhance a guidelines sentencing range based on obstruction of justice, which often results in more time served in prison, a district court must make explicit findings that not only did the defendant give false testimony, but also that the falsehoods were willful and material to the criminal charges. We decline to adopt a more forgiving standard, which could have the unintended consequence of chilling a criminal defendant's willingness to take the stand and give testimony in his or her defense. To require explicit findings on elements needed for the obstruction of justice enhancement helps ensure reliability and reviewability of a sentencing decision.

*United States v. Herrera-Rivera*, 832 F.3d 1166, 1174-75 (9th Cir. 2016) (quoting

*United States v. Castro-Ponce*, 770 F.3d 819, 823 (9th Cir. 2014)).

The elements of perjury are: 1) the testimony was provided under oath; 2) the

testimony was false; 3) the false testimony was material to the matter before the

Court, meaning the false testimony had a natural tendency to influence, or was

capable of influencing, the actions of the jury, and; 4) the defendant acted willfully,

---

[3] While acknowledging the holding in *Dunnigan*, Mr. Mauri also raises a constitutional issue with the application of § 3C1.1 for "perjury". *See infra.*

meaning deliberately and with knowledge that the testimony was false. Ninth Circuit Manual of Model Criminal Jury Instructions, § 24.15 (Perjury – Testimony).

This elemental analysis is required, independently, for each alleged instance of perjury. *United States v. Irving*, 593 F.Supp.2d 140, 142 (D.C.Cir. 2009) (court "must analyze separately" on each alleged instance and "make particularized findings with respect to whether perjury has been established.")

There is insufficient evidence that Mr. Mauri's constitutionally-protected trial testimony was false, material to the jury's deliberations, and that any such testimony was provided willfully.

**A.    The Commission's commentary extending obstruction of justice to perjury violates *Kisor* and *Loper Bright*.**

The text of § 3C1.1 makes no mention of perjury; perjury is only offered as a justification for imposing the enhancement through the commentary to the Guidelines. U.S.S.G § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

The commentary provides:

> Limitations on Applicability of Adjustment.—This provision is not intended to punish a defendant for the exercise of a constitutional right.

A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

U.S.S.G. § 3C1.1, Application Note 2.  The commentary further provides:

Examples of Covered Conduct.—The following is a non-exhaustive list of examples of the types of conduct to which this adjustment applies:

[…]

(B) committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction[.]

U.S.S.G. § 3C1.1, Application Note 4(B).

At the time the Supreme Court issued *Dunnigan*, the guideline provided:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

U.S.S.G. 3C1.1 (1993).  The relevant commentary provided:

This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light

most favorable to the defendant.

U.S.S.G. § 3C1.1, Application Note 1 (1993).

> 3. The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies:
>
> […]
>
> (b) committing, suborning, or attempting to suborn perjury[.]

U.S.S.G. § 3C1.1, Application Note 3(b) (1993).

As chronicled above, the relevant commentary has been amended since *Dunnigan*. Amendment 566 changed the note to no longer suggest a heightened standard of proof, by deleting earlier commentary that "such testimony or statement should be evaluated in a light most favorable to the Defendant." USSG App. C, Vol. 1, Amd. 566 (Reason for Amendment). In Amendment 566, the phrase "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice" was added to address a circuit conflict over the correct standard of proof to apply. *Id*.

Returning to *Dunnigan*, the Supreme Court explicitly relied on the commentary to the obstruction of justice guideline to conclude that perjury qualifies as obstruction of justice.

> Were we to have the question before us without reference to this commentary, we would have to acknowledge that some of our precedents do not interpret perjury to constitute an obstruction of justice

unless the perjury is part of some greater design to interfere with judicial proceedings. *In re Michael*, 326 U. S. 224, 228 (1945); *Ex parte Hudgings*, 249 U. S. 378, 383 (1919). Those cases arose in the context of interpreting early versions of the federal criminal contempt statute, which defined contempt, in part, as "misbehavior of any person ... as to obstruct the administration of justice." 28 U. S. C. § 385 (1940 ed.) (Judicial Code § 268), derived from the Act of Mar. 2, 1831, Rev. Stat. § 725. See also 18 U. S. C. § 401(1) (same).

507 U.S. at 93. The Court elaborated:

> In *Hudgings* and *Michael*, we indicated that the ordinary task of trial courts is to sift true from false testimony, so the problem caused by simple perjury was not so much an obstruction of justice as an expected part of its administration. *See Michael*, 326 U. S., at 227-228. Those cases, however, were decided against the background rule that the contempt power was to be confined to "'the least possible power adequate'" to protect "the administration of justice against immediate interruption of its business." *Id*., at 227 (quoting *Anderson v. Dunn*, 6 Wheat. 204, 231 (1821)).

*Id*. at 93-94. The Court thus relied on the commentary to interpret the guideline.

> Even on the assumption that we could construe a sentencing guideline in a manner inconsistent with its accompanying commentary, the fact that the meaning ascribed to the phrase "obstruction of justice" differs in the contempt and sentencing contexts would not be a reason for rejecting the Sentencing Commission's interpretation of that phrase. In all events, the Commission's interpretation is contested by neither party to this case.

*Id*.

Under *Kisor v. Wilkie*, 588 U.S. 558 (2019), and *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), Mr. Mauri contests the Sentencing Commission's interpretation of obstruction of justice. Mr. Mauri starts with *Kisor*.

**B.  The commentary is an unreasonable interpretation of obstruction of justice.**

"For many years, the leading case on how courts should treat definitions, examples and other information in the Guideline commentary has been *Stinson v. United States*, 5028 U.S. 36 (1993)."  *United States v. Scheu*, 75 F.4th 1126, 1128 (9th Cir. 2023) (recognizing the more recent Supreme Court opinion in *Kisor* now controls); *see also United States v. Castillo*, 69 F.4th 648, 654 (9th Cir. 2023) ("The more demanding deference standard articulated in *Kisor* applies to the Guidelines' commentary.").

*Stinson* "clarified the legal force of the Guidelines' commentary."  *Id*. at 654. It "examined whether courts are bound by the commentary's interpretation of the Guidelines".  *United States v. Dupree*, 57 F.4th 1269, 1273 (11th Cir. 2023).

In *Stinson*, the Supreme Court recognized the Sentencing Guidelines manual contains three kinds of text:  guidelines provisions, policy statements, and commentary.  508 U.S. at 40-41.  That Court detailed that Congress delegated and reviewed the guidelines.  *Id*. at 41.

> The *Stinson* Court explained that the Sentencing Commission, created by the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq., "promulgate[d] the guidelines by virtue of an express congressional delegation of authority for rulemaking" – the "equivalent of legislative rules adopted by federal agencies." *Stinson*, 508 U.S. at 44–45. And any amendment to the Guidelines must be submitted to Congress for a six-month period of review, during which time Congress can "modify or disapprove them." *Id*. at 41.

*Castillo*, 69 F.4th at 655.

In contrast, it recognized "the Guidelines' commentary is not subject to mandatory Congressional review." *Id*. (citing *Stinson*, 508 U.S. at 45). Thus, under the Supreme Court's administrative law analogy, commentary is "akin to an agency's interpretation of its own legislative rules." *Stinson*, 508 U.S. at 45. In *Stinson*, the Supreme Court invoked the agency-deference precedent in *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945), colloquially then known as *Seminole Rock* deference, and now known as *Auer* deference. "Under the administrative agency analogy then, 'commentary [should] be treated' and receive the same level of deference as, 'an agency's interpretation of its own legislative rule.'" *Castillo*, 69 F.4th at 654 (quoting *Stinson*, 508 U.S. at 44).

Applying *Seminole Rock*, the Court in *Stinson* held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id*. at 38. Moreover, the Commission's amendments to the commentary control if "the guideline which commentary interprets will bear the construction." *Id*. at 48. Consequently, "[o]n its face, Stinson's plain-error test seemed to require courts to give great deference to the commentary." *United States v. Riccardi*, 989 F.3d 476, 484 (6th Cir. 2021).

Notably, under *Stinson* deference, commentary "provides concrete guidance as to how even unambiguous guidelines are to be applied in

practice." *Id*. at 44. As a result, even when commentary may expand the meaning of the Guidelines, if it is not plainly inconsistent with the Guidelines, it is binding on the federal courts. *Id*. at 44–45.

*Castillo*, 69 F.4th at 654 (quoting *Stinson*).

In *Kisor*, reviewing the department of Veterans Affairs' own interpretation of the VA'a regulations, the Supreme Court re-examined *Auer* deference. "*Kisor* reaffirmed the existence of, but limited the scope of, '*Auer/Seminole Rock* deference'". *Scheu*, 75 F.4th at 1129. The Supreme Court acknowledged that in the years following *Seminole Rock* and *Auer*, it had sent "mixed messages" about how courts should apply *Auer* deference, sometimes applying the doctrine to uphold agency interpretations "without significant analysis of the underlying regulation." *Kisor*, 588 U.S. at 574 (citing *United States v. Larionoff*, 431 U.S. 864, 872 (1977)).

The Supreme Court also cautioned that, read in a vacuum, *Seminole Rock*'s classic formulation of the test – whether an agency's interpretation is "plainly erroneous or inconsistent with the regulation" – suggested "a caricature of the doctrine, in which deference is reflexive." *Kisor*, 588 U.S. at 574 (internal quotation marks omitted). The danger with deferring when a regulation is unambiguous, the Court explained, is that it would effectively allow an "'agency, under the guise of interpreting a regulation, to create de facto a new regulation.'" *Id*. at 575 (quoting *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)). "*Auer*," the Supreme Court stated, "does not, and indeed could not, go that far." *Id*. Thus in *Kisor*, the

Court thought "it worth reinforcing some of the limits inherent in the *Auer* doctrine" to "cabin[] *Auer*'s scope in varied and critical ways." *Id*. at 574 and 580.

"First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id*. at 574 (citing *Christensen*, 529 U.S. at 588; *Seminole Rock*, 325 U.S. at 414)). That examination requires the court to "exhaust all the 'traditional tools' of construction", before finding ambiguity. *Id*. at 575 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n.9 (1984)). Exhaustion is vigorous, before "a judge [can] conclude that it is 'more [one] of policy than of law." *Id*. (quoting *Pauley*, 501 U.S. at 696) (brackets in *Kisor*). A regulation may be "impenetrable on first read" and "make the eyes glaze over", "[b]ut hard interpretative conundrums, even relating to complex rules, can often be solved." *Id*. (citing *Pauley*, 501 U.S. at 707 (Scalia, J., dissenting)). That effort demands "a court 'carefully consider[]' the text structure, history, and purpose of a regulation", *id*. (citing *Pauley*, (Scalia, J., dissenting), before "resort to *Auer* deference". *Id*.

Even after that exhausting interpretative process, if the text of a regulation is "genuinely ambiguous," the agency's reading must satisfy several other criteria before a court can resort to *Auer* deference. The agency's reading must be "reasonable" and "within the zone of ambiguity the court had identified after employing all its interpretive tools." *Id*. at 575-576. "And let there be no mistake:

That is a requirement an agency can fail." *Id*. at 576. The court must consider whether the interpretation is the agency's official position, implicates the agency's substantive expertise, and reflects the agency's fair and considered judgment. *Id*. at 577-579.

"*Kisor*'s limitations on *Auer* deference restrict an agency's power to adopt a new legislative rule under the guise of reinterpreting an old one." *Riccardi*, 989 F.3d at 485 (applying *Auer* to Sentencing Guidelines). The Ninth Circuit agrees that the "more demanding deference standard articulated in *Kisor* applies to the Guidelines' commentary." *Castillo*, 69 F.4th at 655.

Here, as explained by the Supreme Court in *Dunnigan*, the Commission utilizes commentary to redefine obstruction of justice, contrary to Supreme Court precedent. Obstruction of justice is not within the Commission's expertise. That is the province of the courts. It is "the ordinary task of trial courts". *Dunnigan*, 507 U.S. at 93. As such, "the problem caused by simple perjury was not so much an obstruction of justice as an expected part of its administration." *Id*. at 93. For the Sentencing Commission to decide otherwise via commentary is unreasonable and not within the guideline's zone of ambiguity. *Kisor*, 588 U.S. at 575-576. And the Commission's commentary, overriding the Supreme Court's interpretation of obstruction of justice, is not fair and considered.

**C.    *Loper Bright* ends deference to such agency interpretation.**

*Loper Bright* eliminated such deference. *See*, *e.g.*, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 410 (2024).  In *Loper Bright*, the Supreme Court ruled that "statutes, no matter how impenetrable do – in fact, must – have a single, best meaning." *United States v. Trumbull*, 114 F.4th 1114, 1126 (9th Cir. 2024) (Bea, J., concurring (quoting *Loper Bright*, 603 U.S. at 400)).  That controlling authority eliminates deference to the commentary for a guideline, which is interpreted as a statute, *United States v. Scheu*, 83 F.4th 1124, 1128 (9th Cir. 2023), just like the statutory authority in *Loper Bright*.

Consequently, the Supreme Court forbids deference to the Sentencing Commission's interpretation of a guideline a court deems ambiguous.  *See*, *e.g.*, *Loper Bright*, 603 U.S. at 408 ("such an impressionistic and malleable concept [as ambiguity] cannot stand as an every-day test for allocating interpretive authority between courts and agencies") (internal quotation and citation omitted).

Again, courts interpret the guidelines like statutes.  *Scheu*, 83 F.4th at 1128. *Loper Bright* expressly ends judicial deference to agency interpretation based on an ambiguous statute.  603 U.S. at 499-400.  The Supreme Court anchored its holding in Article III, fundamentally re-establishing that "the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts.'"  *Id*. at 385 (quoting The Federalist N. 78, p. 525 (J. Cooke ed. 1961 (A. Hamilton)); *see also id*. ("[i]t is

emphatically the province and duty of the judicial department to say what the law is") (quoting *Marbury v. Madison*, 5 U.S. 137 (1803)).

In reviewing the constitutional history of judicial deference to agencies, the Court distinguished agency determinations of fact from those of law. *Id*. at 387 (italics in original). The Court emphasized the consequence of this distinction:

> But the Court did not extend similar deference to agency resolutions of questions of law. It instead made clear, repeatedly, that "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," was "exclusively a judicial function."

*Id*. (string cite omitted).

From these first principles, the Court turned to *Chevron* deference, the Administrative Procedures Act, and ultimately the issue here, judicial deference to agency legal interpretations. It summarized:

> The APA delineates the basic contours of judicial review of such action. As relevant here, Section 706 directs that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

*Id*. at 391. It "thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Id*. at 391-392.

Three aspects of *Loper Bright* control here. First, judges interpret the law. *Id*. at 392. That was the Constitutional premise.

Second, the Supreme Court specifically rejected ambiguity as a basis for agency deference. "[A]mbiguity [does not] necessarily reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question." *Id*. at 399. *Loper Bright* repeated, and repeated, *see infra* 13-14, this rule of law. "[A]mbiguity is not a delegation to anybody, and a court is not somehow relieved of its obligation to independently interpret the statute." *Id*. at 400.

Third, *Loper Bright* especially questioned any such deference to deprive liberty. And it did it twice.

> And we have sent mixed signals on whether *Chevron* applies when a statute has criminal applications. *Compare Abramski v. United States*, 573 U.S. 169, 191, 134 S.Ct. 2259, 189 L.Ed.2d 262 (2014), with *Babbitt v. Sweet Home Chapter, Communities for Great Ore.*, 515 U.S. 687, 704, n. 18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).

*Id*. at 405. The second time the Court foretold the exact problem with judicial deference to the commentary here.

> [T]he [*Chevron*] doctrine continues to spawn difficult threshold questions that promise to further complicate the inquiry should *Chevron* be retained. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 465–468 (CA5 2023) (plurality opinion) (May the Government waive reliance on *Chevron*? Does *Chevron* apply to agency interpretations of statutes imposing criminal penalties? Does *Chevron* displace the rule of lenity?), aff'd, 602 U. S. 406, 144 S.Ct. 1613, —— L.Ed.2d —— (2024).

*Id*. at 409.

**D.**   **The Court cannot defer to the Commission to interpret an ambiguous guideline; *Loper Bright* expressly rejects ambiguity as a basis for such deference.**

*Loper Bright* undercuts the reasoning and analysis in *Kisor*. The interpretation of the guideline here is indisputably a question of law. *Trumbull*, 114 F.4th at 1117. Also indisputably, guidelines are interpreted as statutes. *Scheu*, 83 F.4th at 1128. Unlike judicial deference to agency fact determinations, *Loper Bright* was unequivocal: courts do "not extend similar deference to agency resolutions of questions of *law*." *Loper Bright*, 603 U.S. at 387 (emphasis in original).

The Sentencing Commission characterizes its commentary as having the same legal "force of policy statements" and instructs that a court's failure to follow the commentary "could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal. *See* 18 U.S.C. § 3742." U.S.S.G. § 1B1.7. But the commentary – unlike the guidelines – is not expressly authorized by statute, not issued following mandatory notice-and-comment rulemaking, and not mandatorily subject to congressional review.

More fundamentally,  Congress did not expressly authorize the Commission to issue commentary. *Stinson*, 508 U.S at 41. The Sentencing Reform Act "does not in express terms authorize the issuance of commentary," but "the Act does refer to it." *Stinson*, 508 U.S. at 41. That reference was in now-Constitutionally-excised 18 U.S.C. § 3553(b), which was not a congressional delegation to the Commission,

but an instruction to sentencing courts. Before § 3553(b) was excised by the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), it stated that in determining whether to depart, courts "shall consider only" the "guidelines, policy statements, and official commentary of the Sentencing Commission."

*Loper Bright* rejects the Commission's expansion of its own authority: "At best, our intricate *Chevron* doctrine has been nothing more than a distraction from the question that matters: Does the statute authorize the challenged agency action?" *Id*. at 407. The answer, here, is no. Congress never authorized commentary. And under *Loper Bright*, courts cannot deem a text to be ambiguous and then defer to an agency for the correct, legal interpretation to bind the judiciary.

As Judge Bea put it, when judges interpret a guideline, "[t]he baseline of judicial review stays in place". *Trumbull* 1144 F.4th at 1123 (Bea, J., concurring). When that judicial review defers to agency interpretation, the Court violates *Loper Bright* by "assigning our interpretive authority – the core of the judicial power – to an agency." *Id*. at 1124 (citing *Kisor*, 588 U.S. at 580-81).

*Loper Bright* rejected ambiguity to defer to agency legal interpretation. "Such an impressionistic and malleable concept cannot stand as an every-day test for allocating interpretive authority between courts and agencies." *Id*. (quoting *Loper Bright*, 603 U.S. at 408). The agency deference in *Kisor*, and here, is premised, first and foremost, on that very ambiguity to allocate legal authority to the commentary.

"*Kisor* held that a court should defer to an agency's interpretation of its own regulation if (1) the regulation is 'genuinely ambiguous' after 'exhaust[ing] all the 'traditional tools of construction'[.]" *Trumbull*, 114 F.4th at 1118 (quoting *Kisor*, 588 U.S. at 574-79). That reasoning "is clearly irreconcilable with the reasoning or theory", *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003), in *Loper Bright*, which expressly rejected ambiguity as "an impressionistic and malleable concept . . . as an every-day test for allocating interpretive authority between courts and agencies." 603 U.S. at 408. *See also id*. at 392 (APA "specifies that courts, not agencies will decide 'all relevant questions of law' arising on review of agency action, § 706 (emphasis added by Court) – even those involving ambiguous laws – and set aside any such action inconsistent with the law as they interpret it."). Indeed, referencing *Kisor*, the Supreme Court rejected the deferential adjudication of the question of law here: "Congress surely would have articulated a similarly deferential standard applicable to questions of law had it intended to depart from the settled pre-APA understanding that deciding such questions was 'exclusively a judicial function.'" *Id*. (quoting *United States v. American Trucking Assns.*, 310 U.S. 534, 544 (1940)).

The Supreme Court repeatedly explained that ambiguity cannot trigger agency deference. "[A]mbiguity is not a delegation to anybody, and a court is not somehow relieved of its obligation to independently interpret the statute." *Id*. at 400. Courts,

not agencies, must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id*.

> The very point of the traditional tools of statutory construction—the tools courts use every day—is to resolve statutory ambiguities. That is no less true when the ambiguity is about the scope of an agency's own power—perhaps the occasion on which abdication in favor of the agency is *least* appropriate.

*Id*. at 401 (italics in original); *see also id*. at 402 ("*Chevron*'s broad rule of deference, though, demands that courts presume just the opposite. Under that rule, ambiguities of all stripes trigger deference."). And, quoting *Kisor*, the Supreme Court noted that deference cannot be justified "just because a court has an 'agency to fall back on.'" *Id*. at 403 (quoting *Kisor*, 588 U.S. at 575).

*Loper Bright* eliminated such deference. *See*, *e.g.*, *Loper Bright*, 603 U.S. at 410-411. As the concurrence in *Trumbull* recognizes, in *Loper Bright*, the Supreme Court ruled that "statutes, no matter how impenetrable do – in fact, must – have a single, best meaning." *Id*. at 1126 (Bea, J., concurring (quoting *Loper Bright*, 603 U.S. at 400)). That controlling authority eliminates deference to the commentary for a guideline, which are interpreted as statutes, *Scheu*, 83 F.4th at 1128, just like the statutory authority in *Loper Bright*.

# RESTITUTION

Mr. Mauri maintains his innocence and disputes the imposition of any restitution. However, in addition to this blanket disputation, Mr. Mauri disputes the PSR calculation of restitution. There is inadequate evidence to support the imposition of the quoted restitution amounts for many of the victims, regardless of the fact of conviction.

The PSR recommends total restitution in the amount of $1,855,025.25.

| Feasley: $190,000 | Flather: $137,740 | Kenner: $250,000 |
|---|---|---|
| Deniakos: $200,400 | Wells: $20,000 | Reedy: $191,332.25 |
| Henry: $10,000 | Marble: $600,000 | Liptzin: $229,258.75 |
| Kane: $7,191.50 | Schmiedeke: $7,902.75 | Zufelt: $4,000 |
| Pezzulo: $2,500 | Lozon: $4,700 | **TOTAL: $1,855,025.25** |

PSR ¶ 172. The Court is aware that Ms. Feasley, the Reedys, and Mr. Kenner obtained civil judgments (or settlements) against Mr. Mauri. *See* Bates USAO-441 (Reedy judgment); Bates USAO-664 (Accounting of Sheriff's Sale and Distribution of Proceeds to Kenner); Feasley settlement agreement available upon request. The Court is also aware of the liens against Mr. Mauri's property. *See* Govt. Trial Exhibits 41 (First American Title list of Liens) and 74a (identifying the Montana State Department of Labor, Northwest Collectors, and Brian Kenner as creditors of those liens).

Only Ms. Feasley, Mr. Flather, Mr. Marble, and Mr. Schmiedeke provided Victim Impact and Financial Loss Statements to the United States Probation Office.

Ms. Feasley does not provide an itemized accounting of their loss, only a flat number – $265,000, less a $75,000 insurance payment. PSR Victim Impact and Financial Loss Statement ("VIS") of Ms. Feasley. Ms. Feasley received a $50,000 settlement from Mr. Mauri's insurance after filing suit. USAO 367. "[W]hen determining the amount of a restitution award under the MVRA, the court must 'reduce restitution by any amount the victim received as part of a civil settlement.'" *United States v. Gallant*, 537 F.3d 1202, 1250 (10th Cir. 2008) (quoting *United States v. Harmon*, 156 Fed.Appx. 674, 676 (5th Cir. 2005)). There is insufficient evidence to impose the requested restitution.

Ms. Flathers requests $137,740 in restitution. *Contrast* USAO 10083 (identifying Flathers' loss as $93,575). Ms. Flathers includes a "total other financial loss" of $9,165. Flathers VIS. The nature of this loss is not identified. There is inadequate evidence to impose restitution for the $9,165 amount particularly, and the $44,165 differential between the government's loss calculation and Ms. Flathers' claim.

Moreover, the PSR reports Mr. Kenner paid Mr. Mauri a total of $332,556. PSR ¶ 25. Kenner subsequently filed a civil suit in Montana state court and, following default judgment, seized and resold $173,104.63 (after attorney's fees)

worth of Mr. Mauri's property.  PSR ¶ 28.  The difference between Kenner's payment and the proceeds of the auction are $159,451.37.  Mr. Kenner claims $250,000 in restitution without explanation or supporting documents.  PSR ¶ 51.

The Reedys request $191,332.25.  *Contrast* Bates 10083-85 (reporting Reedys received a secured $1,000,000 judgment).

Section 3663A defines victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. 3663A(a)(2).  "The harm to the victim must, however, be closely related to the scheme, rather than tangentially linked."  *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015) (per curiam).

Mr. Schmiedeke requests restitution for the unpaid balance of Bitterroot Timber Frames' rental of a telescoping forklift.  Schmiedeke VIS.  Mr. Schmiedeke, or his business, were not identified victims in the Indictment.  Neither is mentioned in the PSR, except as a claimant for restitution.  Mr. Schmiedeke does not present any documentation explaining how his claim is related to Mr. Mauri's wire fraud or money laundering convictions.  Furthermore, Mr. Schmiedeke has already filed a

civil action in Ravalli County Justice Court seeking the claimed amount. Schmiedeke VIS.

Ms. Kane, Mr. Pezzullo, Mr. Zufelt, and Mr. Lozon are similarly situated to Mr. Schmiedeke. Each claim represents unpaid wages. Final PSR Attachment (victim addresses). These alleged unpaid wages are outside the scope of Mr. Mauri's fraud conviction. The government has not submitted any documentation supporting the claims of Mr. Pezzullo, Mr. Zufelt, or Mr. Lozon. The government did introduce an invoice reflecting Ms. Kane's claim (*see* Govt. Trial Exhibit 24), but nothing further. These four "victims" are not victims of Mr. Mauri's conviction; any losses they suffered are tangential to Mr. Mauri's conviction. Furthermore, except for Ms. Kane's invoice, no evidence has been submitted to support their restitution claims. *See*, *e.g.*, *United States v. Stratos*, 2017 WL 272213, *11 (E.D. Cal. 2017) (in prosecution of employer, no restitution awarded to victim/employee for "failing to provide [victim/employee] with agreed upon wages and benefits".) The government must do more than merely submit general invoices "[o]stensibly identifying [the victim's] losses." *United States v. Menza*, 137 F.3d 533, 539 (7th Cir. 1998). Thus, even if the individuals were victims, there is insufficient evidence supporting the proposed restitution.

# 18 U.S.C. § 3553(a) FACTORS

## A.    The PSR overstates Mr. Mauri's criminal history.

Mr. Mauri's criminal history category is overstated, albeit accurate.   The offenses listed in PSR ¶¶ 88-90 were all related to Mr. Mauri's brief, but serious, struggle with substance abuse.   All were incurred over a 14-month period, fifteen years ago, during which Mr. Mauri was struggling with substance abuse and addiction.   Each offense is related to a specific instance of substance abuse.

The points assigned to the conduct in paragraphs 88, 89, and 90, while properly calculated, overstate Mr. Mauri's criminal history.   The Guidelines provide for downward departure in such circumstances:

(b)    DOWNWARD DEPARTURES.—

(1)    STANDARD FOR DOWNWARD DEPARTURE.—If reliable information indicates that the defendant's criminal history category substantially over represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

U.S.S.G. § 4A1.3(b)(1).  Three criminal history points for a total of one day custody, and all imposed between 14 and 15 years ago, substantially overstates the seriousness of Mr. Mauri's criminal history.

**B.    Mr. Mauri anticipates a restitution order.**

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. § 3553(a)(7); *see also*, *e.g.*, *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution).

Mr. Mauri anticipates this Court will order restitution. Mr. Mauri requests the Court waive interest on unpaid restitution. 18 U.S.C. § 3612(f)(3). As detailed *supra*, Mr. Mauri disputes his guilt and the amount of some of the restitution requests. The Court must consider the need to provide restitution to the victims in determining Mr. Mauri's appropriate sentence. 18 U.S.C. § 3553(a)(7). Sentencing Mr. Mauri to prison would prevent him from making substantial payments toward restitution while incarcerated, and likely diminish his ability to do so upon his return to the community. A goal of sentencing is to maximize, rather than limit (or eliminate), the ability to pay restitution. *Id.*

Moreover, the courts recognize the penal nature of restitution. *United States v. Cloud*, 872 F.2d 846, 854 (9th Cir. 1989) (criminal restitution achieves "penal

objectives such as deterrence, rehabilitation, or retribution"); *United States v. Mindel*, 80 F.3d 394, 397 (9th Cir. 1996) (holding that the "policy of criminal restitution is penal and not compensatory"); *see also United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (affirming substantive reasonableness of sentence where "the district court reasoned that its order of restitution would satisfy the requirement that Edwards's sentence have general deterrent value, and a probationary sentence would best accomplish the goals of the restitution order because it would enable Edwards to earn the money he is required to pay").

## C.     Mr. Mauri is a family man.

Mr. Mauri puts his family first.

> My father, Brett, has always been there for me throughout my entire existence and has played a significant role in my life as an incredibly dedicated and caring father and provider for me and my family. I grew up idolizing my dad as someone who was extremely hard-working, exceptional not only to his family but also to his employees and basically everyone he interacts with. I would not be the person I am today without my father's guidance and love.

Letter of Hannah Mauri, daughter.

> When I think of my dad, I think of the kind of example he set for his children, which was to be a dedicated, honest, and hardworking individual.

Letter of Jessica Mauri, daughter.

> If there is a wrong to be made right I do believe that Brett would do so, which would be impossible if he is sentenced to prison time, as would being there for his youngest children, My little brothers, who need their father in their daily lives still. As a father myself now and my own kids

being just a bit younger I know how crucially valuable that time is for the whole family, especially the kids, I pray that all of this will be considered in whatever decision is made.

Letter of Nicholas Mauri, son.

Many courts have addressed the difficulties in adequately punishing wrong-doers without overburdening their families. After *Booker*, "courts can justify consideration of family responsibilities, an aspect of the defendant's 'history and characteristics,' 18 U.S.C. § 3553(a)(1), for reasons extending beyond the Guidelines." *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (affirming departure for family ties but noting even if departure was error, Booker variance is proper). "District courts now . . . have the discretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed 'not ordinarily relevant,' such as . . . family ties and responsibilities." *Menyweather*, 447 F.3d at 634 (quoting *United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2005) (en banc) (Wardlaw, J., concurring in part and dissenting in part)). *See United States v. Jagemann*, 2007 WL 2325926 (E.D. Wis. Aug. 8, 2007) (finding that prison was not necessary to satisfy the purposes of punishment for defendant convicted of possession with intent to distribute cocaine, in part, because "his family, including his ex-wife, to whom he paid alimony, depended on defendant, and a prison sentence would harm them

without adding significantly to punishment or deterrence") (citing 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A) & (B)).

The punishment that Mr. Mauri's criminal conviction has already inflicted, and will further inflict, upon his children is encompassed within 18 U.S.C. § 3553(a) considerations. *See*, *e.g.*, *United States v. Lupton*, 2009 WL 1886007, *8 (E.D. Wis. June 29, 2009) (noting that defendant's "family suffered serious financial consequences" and that "separation from defendant's family due to a prison term would certainly affect both" the family and the defendant; "I took these factors into account" in determining an appropriate sentence); *United States v. Nowak*, 2007 WL 528194, *3 (E.D. Wis. 2007) ("The court can and should consider the collateral consequences in deciding the appropriate sentence.") (citing *United States v. Norton*, 218 F. Supp. 2d 1014, 1019 n.2 (E.D. Wis. 2002)).

Mr. Mauri's children will "benefit more by [defendant's] presence than society is going to benefit from [his] incarceration." *United States v. Husein*, 478 F.3d 318, 324 (6th Cir. 2007) (affirming sentence of one-day credited for time-served followed by three years of supervised release including 270 days of home confinement, despite 37-to-46 months Guidelines range).

# CONCLUSION

Mr. Mauri respectfully requests a below-Guidelines sentence.

RESPECTFULLY SUBMITTED this 15th day of January, 2025.

BRETT MAURI

/s/ John Rhodes
JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
    Counsel for Defendant

# CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2025 a copy of the foregoing document

was served on the following persons by the following means:

| | |
|---|---|
| __1, 2__ | CM-ECF |
| _____ | Hand Delivery |
| __4__ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| __3__ | E-Mail |

1.    CLERK, UNITED STATES DISTRICT COURT

2.    TIMOTHY RACICOT
      BENJAMIN HARGROVE
      Assistant United States Attorney
            Counsel for the United States of America

3.    ASHLEY HUNTER
      United States Probation Office

4.    BRETT MAURI
      Defendant

                                    By:    /s/ John Rhodes_____
                                           JOHN RHODES
                                           Assistant Federal Defender
                                           Federal Defenders of Montana
                                                Counsel for Defendant